**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|                      |   |                          |
|----------------------|---|--------------------------|
| **In the Matter of** | : |                          |
| **VINCENT PARAGANO** | : |                          |
| **An Attorney at-Law** | : | **Misc. No. 99-mc-81(DRD)** |
|                      | : |                          |
| **Respondent**       | : |                          |
|                      | : | **O P I N I O N**        |

**Appearances by:**

**Charles Centinaro, Director**
**Office of Attorney Ethics**
**P.O. Box 963**
**Trenton, New Jersey 08625**

**Michael Sweeney, First Assistant Ethics Counsel**
**On the Brief**
**Attorneys for the Office of Attorney Ethics**

**Frederick C. Biehl, III, Esq.**
**Soriano, Henkel, Biehl & Matthews**
**75 Eisenhower Parkway**
**Roseland, New Jersey 07068-1693**
**Attorney for Respondent**

**DICKINSON R. DEBEVOISE, U.S. SENIOR DISTRICT JUDGE**

## CONTENTS

I.   Nature of Questions Raised

II.  Credibility Findings

III. The Evidence of Bank Fraud

IV.  The Evidence of Fraud on Partners

4(b) 267 Arlington Street. The parties
acknowledge that there is a conflict
regarding the purchase of this property, and
they have resolved to allow the contract to
lapse, as set forth more particularly below.
No party shall receive any offset of monies
paid for the deposit or title search or
survey costs for such property.

In 2006, Fernandes filed an ethics grievance against
Paragano. It was a long, rambling document containing 22
charges. After receiving the grievance, the OAE investigated and
on November 25, 2008 filed a complaint against Paragano. This
complaint contained two counts and a sub count.

The first count was to the effect that although in the
Separation Agreement Paragano agreed that the Arlington Street
property contract would lapse, and represented that he had no
interest in the property, in fact, unbeknownst to Fernandes and
Champi, Paragano had a purchaser for Arlington Street and had
actually closed on Raritan's purchase contract with the City on
September 24, 2003, the same date when the Settlement Agreement
was signed.

The second count charged that Paragano defrauded the two
banks by submitting documents to them designed to deceive them
and to show that Fernandes and Champi were members - owners of
the borrower Raritan. The sub count charged that Paragano
defrauded Fernandes by assuring him that by virtue of his
interest in Raritan, he was entitled to claim the losses incurred

by Raritan on his taxes.

The hearing on the complaint extended for 13 days between April 5, 2010 and June 10, 2010 and included a multitude of documents and many witnesses. Replacing David Trombadore, Esq., retired Judge Herbert S. Friend was appointed Special Master to hear the case. The factual issues were difficult.

The Special Master's very brief Final Report was not helpful in guiding a reader through the maze of evidence. It stated the charges and then found that Paragano was guilty of each of them in the most general terms. It failed to evaluate the very detailed review of this evidence that both Paragano's and the OAE's attorneys had submitted concerning the alleged bank fraud and the alleged fraud on Paragano's partners. Particularly disturbing was the Special Master's unqualified acceptance of the credibility of the grievant, Fernandes, when there was considerable evidence in the record casting doubt on his credibility. Finally, the Special Master appeared to rely heavily on Paragano's prior ethics violation and upon the belatedly submitted documents from Paragano's file (LP-1 to LP-10) that the Special Master characterized as "forgeries."[2]

---

[2] At the outset of the case, David Trombadore was appointed Special Master. Paragano moved before him to preclude use of any prior ethics infractions as part of the hearing phase of the case or during cross-examination. Special Master Trombadore granted the motion on the ground that the prior conduct occurred many years ago, involved totally different people and facts and had nothing to do with the case at hand. He excluded such evidence unless OAE proffered at trial how the past conduct was specifically linked to the present conduct. Subsequently Special

## II. **CREDIBILITY FINDINGS**

In an original report and in his final report, the Special Master found without qualification that Fernandes was truthful and credible as a witness. In the usual case, great weight is given to a hearing officer's credibility findings, as he has heard and observed the witnesses as they testified. In the present case, there are a number of items casting serious doubt on the credibility of Paragano's partner, Fernandes, matters which the Special Master's Report did not address.

Fernandes filed a long, rambling ethics grievance against Paragano in 2006, making all sorts of charges of wrongdoing. At that time, or before, Fernandes was engaged in a bitter legal controversy with Paragano. One theme runs through the grievance, namely, that Paragano, an experienced attorney, represented as an attorney, the less experienced Fernandes and Champi, as well as the joint venture. This was clearly not the case. At the outset of the joint venture in a March 27, 2003 letter, Paragano had written Champi and Fernandes, stating among other things, "[a]lthough I am an attorney, I have not represented either of you as an attorney in regard to this transaction or in regard to our business relationship." Both Champi and Fernandes signed at the foot of the letter to the effect that "[t]he above terms, conditions and statements are hereby agreed to and acknowledged."

Master Friend replaced Mr. Trombadore.

The OAE did not accept Fernandes' representation of an attorney-client relationship, and thus the entire Fernandes grievance is founded on a false premise.

Fernandes was prepared to defraud taxing authorities by falsely claiming that he had a membership interest in Raritan, entitling him to claim the losses incurred by Raritan on his federal income tax return. Fernandes knew perfectly well that he did not have an interest in Raritan. Surprisingly, the OEA was bamboozled by this claim and included in its complaint a charge that "Respondent also misled Fernandes with believing that Fernandes would be able to claim losses incurred by Raritan on his (Fernandes') taxes," a charge that the DRB rejected.

Further, Fernandes was not above concealing from his partners the true value of the Ege property at the time when they were negotiating the Settlement Agreement. The negotiations included allocation of the properties that were under contract so as to make a fair distribution of the assets of the enterprise. One of these properties was the contract to purchase 94-96-98 Ege Avenue in Jersey City, which Fernandes was to receive. Fernandes failed to disclose that he had already located a buyer and was negotiating to "flip" the Ege property, anticipating a substantial profit. Additional examples of Fernandes' disregard for the truth will be provided below.

### III.  **THE EVIDENCE OF BANK FRAUD**

Although there are numerous documents in evidence in which Fernandes and Champi are listed as "members" of Raritan, which was untrue, there is not clear and convincing evidence to support the Count II charge that Paragano committed bank fraud by their misrepresentation in order to induce the banks to extend loans. In fact the evidence is to the contrary. It is undisputed that loan documents, many signed by the three partners, were submitted to the banks on which Fernandes and Champi were listed as "members" of Raritan. This was an immaterial representation because Fernandes and Champi were fully liable to the bank as guarantors. The evidence is strong that the erroneous listing of Champi and Fernandes was the result of blundering and confusion on the part of the participants in the many loan and real estate transactions – not the result of fraud on the banks on the part of anyone.

The confusion may have derived from Fernandes' misrepresentation to Pamrapo Bank official Mr. Asman. Fernandes: He was asked, "Did you identify yourself as a partner of [Raritan] to Mr. Asman?" and he responded: "I referred to myself as a partner, yes." He testified that he signed documents that were untrue, created by the bank, showing that he was a member of Raritan. Seeking to sink his enemy, Paragano, he explained, "I was participating in a scheme that was invented by Paragano . . ."

There was no evidence that Paragano was participating in such a scheme; he had disclosed to the two banks the fact that he was the sole member and owner of Raritan and that the role of Fernandes, Champi and himself was to be guarantors of the loans.

All the relevant information was set forth in Provident's loan approval form for the Ramapo line of credit, information that was also available to Pamrapo:

The Guarantor/Endorsers and their assets were listed as follows:

| Vincent Paragano | $3,354,720 |
| Samuel F. Champi, Jr. | $ 650,750 |
| Adolphus Fernandes (Sr.) | $ 780,000 |

Borrowers:    Raritan Bay Associates, LLC
              A New Jersey Limited Liability Company

              100% Vincent Paragano

Guarantors:   The line of credit will be personally
              guaranteed by Vincent Paragano, Samuel F.
              Champi, Jr. And Adolphus A. Fernandes

The banks were fully aware of these facts before and after the closings as disclosed by the documents in their possession. In fact, even though they sought and obtained the guarantees of Fernandes and Champi, their reliance was on the strength of Raritan and the wealth of Paragano. This was made evident when on December 17, 2003, after the joint venture terminated, Fernandes and Champi were removed as guarantors.

Apart from Fernandes' self-incriminating and clearly false testimony that "[he] was participating in a scheme [to portray to

the bank that he was a member of Raritan] that was invented by
Paragano" , there is no evidence that Paragano engaged in a
scheme to defraud the bank or to mislead Fernandes into believing
that Fernandes would be able to claim the losses incurred by
Raritan on his taxes.

## IV. **THE EVIDENCE OF FRAUD ON PARTNERS**

The First Count of the Complaint was to the effect that
Paragano defrauded his partners by failing to disclose to them
that, notwithstanding Paragraph 4(b) of the Settlement Agreement
providing that the partners would allow the contract for the
purchase of the Arlington Street property to lapse, he had
purchased that property after representing that he had no
interest in it. There is no dispute that the executed Settlement
Agreement contains Paragraph 4(b) and that despite numerous
revisions and drafts of the Settlement Agreement, that Paragraph
was never deleted or amended to permit the purchase of Arlington
Street. Paragano maintains that this failure was due to
inadvertence by the partners and that Fernandes was well aware of
its purchase on September 24, 2003.

The facts are complex and numerous. As mentioned above,
each attorney submitted to the Special Master a detailed analysis
of the evidence supporting his position. Ascertainment of the
facts is complicated by Paragano's submission at the last minute
of documents designated LP-1 to LP-10 that the Special Master

characterized as "forgeries" designed to establish Fernandes' and Champi's knowledge and consent to the purchase of Arlington Street.

The contentions of each side will be summarized below.

## A. **PARAGANO'S VERSION**

There is substantial evidence that Fernandes and Champi were aware of the Arlington Street purchase on September 24, 2003 when it was effected.

All three of the partners were aware of the Jersey City public auction rule and requirement that no party can purchase property from Jersey City if it had previously breached a contract with the City. The purchasers had to certify that they had never had a direct or indirect interest in any partnership, firm or corporation which had breached a contract for the purchase of property from the City. Therefore, were the contract for the purchase of the Arlington Street property allowed to lapse, Raritan, Paragano, Fernandes and Champi would have been precluded from purchasing other properties that they had under contract with the City.

At the time when the Settlement Agreement was being negotiated, there were three properties subject to contract with the City – Arlington Street, Ege, and Park. Fernandes and Champi were trying strenuously to obtain from the City an extension of the closing date for each of them, including Arlington. They had

to close on all three or they couldn't close on any of them.

On September 5, 2003, the parties received a notice of default from the City declaring the City ready to default on all three pending contracts. This produced a series of e-mails between the parties. The notices included three separate resolutions relating to Arlington, Ege and Park that would have "cancelled the sales" and the deposits forfeited "due to the fact that the purchasers failed to pay the balance of the purchase price" by closing on the properties. The resolutions were to be presented for approval before the Municipal Council on September 10, 2003.

Fernandes wrote an e-mail to Paragano on September 8, 2003, which stated, in part, that "I received the same notice when I came home late Friday evening, September 5, 2003. This is a notice that the City almost always follows through on and therefore a serious matter. I spoke to Sam Champi on the weekend to see if he can get his senior contact at the city to get us one last extension. . ." The request for an extension was for all three properties which had been the subject of the City's notice – Arlington, Ege and Park, making no sense of Fernandes' argument that if the parties defaulted on Arlington, they could still purchase Ege (for which Fernandes had a highly favorable sales contract that he had not disclosed to Paragano and Champi during their allocation of properties and negotiations of the Settlement

Agreement). Nevertheless, Fernandes also testified, "Not to default on anything is an important matter, if you can afford to close on it, and Mr. Paragano had made arrangements to fund the transactions."

Champi obtained the final extension to close on Arlington, Park and Ege through September 23, which the Jersey City real estate office later extended by one day to September 24, 2003. Park Street was closed a few months later, after Jersey City resolved a title issue. The three transactions were saved by the extension of the closing date. This was critical to Fernandes in order that Ege could close and be able to complete his undisclosed sale and realize the profit thereon.

On September 18, 2003, according to Fernandes' testimony, he met with Ronald Shaljian, Esq., a partner in Boffa's law firm. The handwritten notes from that meeting by stipulation were in Shaljian's handwriting and came from Boffa's file. These notes disclose that Shaljian learned from Fernandes that: "Arlington, Ege, Park St." were "to close w/in next week." The notes also state that, "Line of credit from Provident Bank." In fact, Arlington and Ege closed on September 24, 2003 using Provident Bank's line of credit. When confronted with the notes at the hearing, Fernandes could only comment "an enlightening piece."

Paragano met with Boffa the day before the September 24, 2003 closing. He testified "Boffa indicated to me that Fernandes

wanted to be at the closing, and I was insistent that he be there."

The closings took place in the Jersey City real estate office. According to Paragano, it was supposed to take place at 1:15; but Fernandes was late. When he arrived, they both went into the real estate office in the company of Jersey City personnel Peggy Rausch for part of the time and then Ann Marie Miller. Paragano described the closing as follows:

> They had like a – there were two desks in the place. There might have been a small conference table, but it was two desks. We sat in front of one of the desks. I sat at one spot. Mr. Fernandes sat at the other spot. Like I expected, the closing took all of five, ten minutes tops. They already had the paperwork done. I think for part of it, Adolphus wanted to stand so he could see what was going on. He stood. I signed the two closing statements. I gave them the two checks. They gave me the two Deeds. They gave me back the two closing statements. That part was done for Ege and Arlington.

Paragano also testified that "before Adolphus left, I told him I would make copies and send them over to his attorney. And a few days later when I finally got back in the office and I unpacked my briefcase, I arranged to send everything out to them."

According to Paragano, Fernandes' denial that he attended the September 24, 2003 closing on Arlington is unconvincing. He was initially asked by the OAE, "Did you attend the closing for Arlington Bay on 9/24/03? Or Arlington Street, not Arlington

Bay?", he responded: "I was supposed to meet Mr. Vincent Paragano at around one o'clock." He did not deny attendance until after further prompting by the OAE, as follows: "Just answer my question, Did you attend the closing for Arlington on September 24, 2003?", to which he answered, "No, I did not."

This answer was given in spite of other testimony of Fernandes: "We (he and Paragano) agreed to meet that afternoon at one o'clock outside the Jersey City, the real estate office, so we could go to the closing together . . .", "Ege Street was definitely supposed to close that day, and I went."

The undisputed facts in the record negate Fernandes' contention that he was not at the September 24, 2003 closing of Arlington Street. It was established that if the partners defaulted on any contract with Jersey City, they could not proceed on the others. Fernandes had a compelling interest to close on the Ege contract, which he could not do if there had been a default on the Arlington contract. The City threatened to declare the Arlington, Ege and Park contracts in default. All three partners made strenuous efforts to persuade the City authorities to extend the closing dates of all three contracts, including Arlington. The closing date for all three contracts was extended to September 24, 2003. The closing took place as scheduled, apart from a title problem that arose with respect to Park. Fernandes testified "Ege Street was definitely supposed to

close that day, and I went." If he went to the Ege closing, he necessarily went to the Arlington closing. His denial is unquestionably false. This destroys the OAE's charge that Paragano defrauded his partners by failing to advise them of his sale of Arlington Street. They were aware of the sale and participated in actions to bring it about.

## B. **OAE VERSION**

On March 19, 2003 Paragano, on behalf of Raritan, signed a contract for the purchase of 267 Arlington Street from Jersey City. Each of the partners contributed one-third of the $13,600 deposit. When other expenses were added, the parties contributed approximately $19,300 toward the Arlington acquisition. Subsequently, the parties had a falling out and negotiated a termination of their relationship. Eugene Boffa, Esq. represented Fernandes, and Robert Delvanthal, Esq. represented Champi. As of September 18, 2003, the parties decided that they did not want to go through with the Arlington purchase and that they would lose their deposit.

Considerable correspondence between the parties took place during the negotiations concerning the Jersey City properties. Each, including the October 28, 2003 settlement agreement acknowledged the parties' intentions to let the Arlington contract expire with the resultant loss of the deposit and other investment costs. The settlement agreement was signed at Boffa's

office on October 28, 2003.  It contained the paragraph providing for the lapse of the Arlington Street contract.  This was preceded by the exchange of drafts of the settlement agreement between the parties and their attorneys, all of which contained the pertinent clause.

On September 22, 2003, Paragano had prepared and distributed a first draft of the settlement agreement containing the critical lapse language.  Two days later, September 24, 2003, unbeknownst to Fernandes, Champi, Boffa and Delvanthal, Paragano, acting through Raritan, purchased the Arlington property, utilizing Fernandes' and Champi's deposit money, as well as funds from the partner's joint line of credit at Provident Bank.

Thereafter, there were continuing discussions between the parties and the attorneys in which they confirmed the instructions to allow the Arlington contract to lapse.  Thus when the final version of the settlement agreement was signed on October 28, 2003, Paragano had a month before secretly purchased Arlington Street.

On the same day that he purchased Arlington Street, Paragano attended a separate closing with Jersey City on the Ege property.  That closing was known to Fernandes, Champi and their attorneys, and was the property referred to in the settlement agreement.  The drafts of the settlement agreement reflect the difference in the treatment of Ege and Arlington and note that Raritan had

purchased Ege, not allowing the Ege contract to lapse.

Additional drafts of the settlement agreement prepared by Paragano reflect his knowledge of the status of the various contracts with Jersey City but failed to correct them as to the status of Arlington; which, as he knew, had been purchased on his behalf by Raritan. There are a number of circumstances that confirm that Fernandes, Champi and their attorneys were unaware of Paragano's September 24, 2003 purchase of Arlington.

By letter dated September 26, 2003, Paragano confirmed to Fernandes, Champi and their attorneys only the Ege Avenue purchase. His letter enclosed the various documents for Ege. He did not provide the closing documents and information concerning Arlington which closed at the same time as Ege. This was because Ege was being conveyed to Fernandes as part of the settlement.

One day after the September 24 closing, Fernandes wrote Boffa in an e-mail that he had agreed with Paragano to share 1/3 of the Arlington lost deposit, indicating that neither he nor Boffa was aware of the Arlington purchase.

During the settlement negotiation, Boffa was the person who calculated the offsets and credits which wound up in the final agreement. He did not include any offsets or credits for Arlington because it was understood that that contract would lapse. Those calculations are set forth in P-29. Boffa computed the total value of the remaining properties plus interest to be

allocated among the three partners to be $252,675.80. He showed that with all the credits and debits owing to each, Paragano was to receive assets worth $48,962. He had to receive assets worth $35,263 to bring this to his one-third share of $84,225. The precise calculations are set forth in the OAE's written summation submitted to the Special Master. Arlington was not included in these calculations. Fernandes authorized a check in this amount payable to Paragano.

At the hearing, Fernandes, Champi, Boffa and Delvanthal testified about the course of the negotiations and each confirmed that it was his understanding that the Arlington contract would be allowed to lapse. In particular, Fernandes testified about the September 24, 2003 closing. He went to the event but when he arrived, the closing had already taken place. He was informed of the Ege closing, but Paragano said nothing about a closing on the Arlington contract.

Only very late in the investigation and hearing on the charges did Paragano introduce his contention that Fernandes actually attended the Arlington closing and that Fernandes, Champi and their lawyer received written and oral notice of his Arlington purchase. He raised these defenses for the first time during the hearing. These defenses would have completely exonerated him. They were not included in his answers to the OAE complaint; he did not raise them when being examined at the

hearing; the exculpatory documents were not provided during discovery; Paragano's pre-trial report submitted to the former Special Master did not suggest that Paragano was contending that Fernandes had attended the Arlington closing or that Paragano had provided written, verbal and e-mailed notice to Fernandes, Champi, Boffa and Delvanthal of the Arlington closing. No mention of these defenses was contained in Paragano's Pre-trial brief. All this bears on the Special Master's finding that documents LP-1 to LP-10 were fraudulent. They will be discussed below.

## V. **THE SPECIAL MASTER'S REPORT**

Due to the complexity of the facts in this case and the extreme difficulty in determining exactly what happened, a Special Master was appointed to hear the testimony, review the documents and report to the DRB and the Supreme Court. The New Jersey Rules of Court 1:20-6(b) provide for the appointment of a special ethics master to try an ethics case with the full power and authority of a hearing panel, which includes the power and duty to submit to the DRB with findings of fact, conclusions of law and recommendations, together with the record of the hearing. NJ Court Rule 1:30-6(3)(B). The DRB must of necessity in a case as complex as this one, rely extensively on the Special Master's report.

In response to the most detailed analysis of the testimony

and documents contained in the attorneys' post-hearing briefs, the Special Master's report is only the most conclusory of documents and does not respond to the attorneys' well reasoned and documented briefs.

As to the Second Count, the Report again ignored the extensive evidence that Paragano represented and the bank believed that he was 100% owner and sole member of Raritan, with Fernandes and Champi, along with Paragano, serving as guarantors. Instead, in the most conclusory fashion, the Report stated "Respondent participated in a scheme whereby Respondent, Fernandes and Champi executed documents representing that Fernandes and Champi were members of Raritan . . . The purpose of this scheme was to mislead the lending institutions to whom Respondent, Fernandes and Champi were applying for loans into believing that all three were members of Raritan." Further, the Report stated, "Respondent misled Fernandes into believing that Fernandes would be able to claim a part of the losses incurred by Raritan on Fernandes' taxes."

The Report supports its findings with the LP-1 through LP-10 documents, each of which the Report characterizes as a forgery and was created to support Paragano's claims that his partners were aware of the Arlington closing and did not object. They will be discussed subsequently.

## VI. THE LP-1 THROUGH LP-10 LETTERS

The Special Master and the DRB characterize the LP-1-LP-10 letters as forgeries submitted by Paragano to fortify his contention that Fernandes and Champi were aware of and, in the case of Fernandes, participated in the Arlington Street closing on September 24, 2003. They relate to the charge of fraud on the partners and (with one exception) not to the charge of fraud on the two banks.

Paragano's and the OAE's marshaling of the evidence concerning disclosure of the Arlington purchase to Paragano's two partners was summarized above. It is quite apparent that even without consideration of the LP-1 to LP-10 documents, the evidence points to the conclusion that Paragano did not disclose his purchase in a timely manner and that Fernandes did not attend the Arlington purchase. The Special Master's report did not discuss the evidence at any length, nor did his Report review in detail the L-1 to L-10 documents that he found to be forgeries. However, the OAE's written summation delivered to the Special Master sets forth the circumstances of the L-1 to L-10 documents in their entirety and the evidence establishing the falsity of each individual document in meticulous detail. If there were any doubt about the fraud that Paragano perpetrated upon his partners, this evidence would eliminate that doubt.

The OAG's ultimate conclusion was that all of the LP documents are fraudulent and were created by Paragano with the

intention of springing them on the OAE for the first time at the
hearing.  No LP documents were provided in discovery or
referenced in any way in pretrial submissions.  The legitimate
documents in the record reflect the parties' agreement to permit
the contract on the Arlington property to lapse.  The LP
documents suddenly appeared on the eve of the hearing, resulting
in an adjournment and an investigation by the OAE that disclosed
the fraudulent nature of each document.

The OAE's submission treats each individual document and
demonstrates that it was belatedly altered or created to support
Paragano's position.  For example, LP-1 is a September 29, 2003
letter from Paragano to the Register of Hudson County showing
copies to Boffa and Delvanthal.  At the time, this letter was
first revealed by Paragano, the parties were under the impression
that Boffa's file could not be located.  Subsequently, it was
located, and it contained no copy of the September 29, 2003
letter or any of its enclosures.  The same situation exists with
respect to other documents that show copies going to Fernandes,
Champi, Boffa and/or Delvanthal.  Paragano was unable to show
that copies of those documents existed anywhere outside of his
own files.

As another example, falsity is exposed in LP-4, a fraudulent
October 25, 2003 e-mail and LP-5, an alleged letter from Paragano
to Boffa in which Paragano crafted false Arlington language onto

P-30, the legitimate letter that had actually been sent.
Paragano inserted the false letter into his own file to be found
during the OAE's June 23, 2003 inspection. The legitimate letter
was not in Paragano's file during this inspection.

Still another example is LP-2, a letter from the Register of
Hudson County to Raritan dated November 18, 2003 returning a
deed. The supposed signatory of the letter, Penelope Betts, did
not work at the Register's Office until two years after the
letter was supposedly written. Paragano attributed this to a
misfiling of the letter.

It is unnecessary to recount in detail the basis for finding
each LP document to be fraudulent. This is persuasively
accomplished in the OAE's written summation.

With one exception, the LP documents relate to the charge
that Paragano defrauded his partners with respect to his
Arlington purchase. The exception is LP-7 - an affidavit of
title signed by Fernandes, Champi and Paragano as "Mortgagor"
with the term "Member" x'ed out. This is but one of a multitude
of documents prepared in connection with the loan from Pamrapo.
In some, Fernandes and Champi were listed as "members" of
Raritan; in others, "members" was crossed out. OAE contends that
this is evidence of an intent to commit fraud upon Pamrapo. As
discussed in an earlier portion of this opinion, the totality of
the evidence does not establish that this was part of an intent

on Paragano's part to defraud the two banks. Despite the

inaccurate documents describing Fernandes' and Champi's role in

Raritan, both banks understood that Paragano was the sole owner

and member of Raritan and that Fernandes' and Champi's role was

to serve as guarantors of the loans.

What the LP documents accomplish is to confirm that Paragano

did not disclose to his partners that he had purchased the

Arlington parcel, thus establishing Count One of the Ethics

complaint by clear and convincing evidence and establishing that

during the course of the hearing, Paragano committed a fraud upon

the hearing officer.

## VII. **PARAGANO'S OTHER CONTENTIONS**

Paragano advanced other reasons why the disbarment order of

the New Jersey Supreme Court should not be followed. Neither

collectively nor individually do these reasons provide a reason

why this Court should not apply the same discipline.[3]

## A. **FAILURE TO GIVE NOTICE OF PATTERN AND PRACTICE CHARGE**

It is Paragano's contention that in effect the two count

---

[3] In Point Three of Paragano's brief, he advances five due process arguments: 1) right to receive full advance notice of charges; 2) right to cross-examine witnesses and to present evidence it has of a grievant and a principal witness; 3) right to neutral trier of fact; 4) failure of Special Master to disclose prior dealings with a key witness; 5) failure to provide complete pre-hearing discovery. These grounds were not raised before the Special Master, the DRB and the Supreme Court. The OAE asserts that by failing to raise these issues in the State Court proceedings, Paragano has forfeited his right to raise them for the first time in this Court. In re Surrick, 338 F.3rd 224, 235 (2003). In order to avoid lingering doubts about the fairness of the proceedings, this Court will address the merits of Paragano's contentions.

ethics complaint was amended without notice in mid-hearing when the Special Master allowed the OAE to introduce evidence and permit cross-examination concerning an ethics compliant based on facts that had occurred almost 13 years earlier. The Special Master made this ruling in spite of the fact that the prior Special Master had ruled that such evidence and cross-examination should be excluded unless the OAE proffered evidence at trial how the past conduct was specifically linked to the present conduct. No such evidence was offered except for the circumstances that each instance of misconduct involved the failure of Paragano to deal honestly with business associates.

In In re Ruffalo, 390 U.S. 544 (1968) the Supreme Court held that the Ohio Supreme Court had violated an attorney's due process right in disbarring him. The State Disciplinary Board had added a misconduct charge in the middle of the proceedings. The Ohio Supreme Court sustained the additional charge and disbarred the attorney based on that charge. The United States Supreme Court held that the "absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges deprived [the attorney] of procedural due process. Paragano asserts that the present case is governed by Ruffalo and that disbarment deprives him of his due process rights.

The flaw in Paragano's argument is that no new count was added to the OAE's complaint. The opinion of the DRB and the

Supreme Court's ruling were based on the charges contained in the original OAE complaint. The decision to permit evidence of the prior ethic ruling was an evidential ruling and not an addition to the charges against Paragano. This Court might not have made the same evidential ruling were the question originally presented to it. Application of federal and state rules of evidence might call for a different result; the original Special Master had excluded the critical evidence and the conditions he laid out for admitting it may not have been met; State Rule 1:20-7 (m) might well be interpreted to exclude the evidence. This Court, however, must give great deference to state disciplinary proceedings.

When deciding whether to impose reciprocal discipline, this Court must "examine the state proceeding for consistency with the requirements of due process, adequacy of proof and absence of any indication that imposing discipline would result in grave injustice." In re Surrick, 338 F.3d 224 (3rd Cir. 2003). However, decisions of the state court are entitled to respect. Paragano is not asserting a due process claim, i.e., absence of notice or opportunity to be heard, he objects to a critical evidential ruling. This is not one of the infirmities spelled out in Local Rule 104.1 b)(4) which would justify applying a sanction different from that of the state court.

## B.  DEPRIVATION OF RIGHT TO CROSS-EXAMINE WITNESS

In New Jersey as well as elsewhere "[w]hen an administrative determination may have profound consequences, such as the effective loss of a professional license, administrative due process requires that one affected by opposing testimonial evidence have the opportunity to cross-examine the witness." Limongelli v. N.J. State Board of Dentistry, 137 N.J. 317, 324 (1993). The testimony of Fernandes and Champi was critical in this case, conflicting with that of Paragano on important factual issues.

In only the most generalized terms, Paragano charges that the Special Master "rebuffed or severely limited" Paragano's attempt to pursue valid lines of cross-examination, citing evidence of Fernandes' withholding information about the Ege property transaction and Champi's participation in an arbitration proceeding with Paragano entities in which the arbitrator's detailed ruling found Champi to be drunk, incompetent, untruthful and downright deceptive. The record discloses that the Special Master in no way curtailed Paragano's cross-examination.

During the second day of questioning Fernandes there was argument about inquiry into his agreement to sell the Ege property - the Special Master permitted Paragano's counsel to pursue the Ege issues. The Special Master did not bar Paragano's counsel from introducing the Champi arbitration documents and issued no rulings during Champi's testimony barring Respondent's

counsel from asking Champi about any subject matters.  There is
no evidence that Paragano's cross-examination was unfairly
curtailed.

## C.  **FAILURE TO PROVIDE NEUTRAL AND UNBIASED TRIER OF FACT**

This objection is an attack on the pre-January 1, 2011
procedure in New Jersey for selecting special masters, a
procedure applicable when Paragano's case was heard.  Under the
procedure, the Director of OAE was responsible for selecting and
placing individuals on the OAE's approved panel list.  The
Director could add or remove special masters from the approved
panel list at his discretion.  Thus the Director could designate
who the judge in any case might be.  Because an order for
discipline typically included an order that the respondent pay
the expenses of the proceeding, the Director had a motive for
appointing special masters who would rule in the OAE's favor.  An
unfavorable ruling would entail the OAE paying all expenses from
its own budget.  In practice, unless the Respondent could show
cause, the Supreme Court would approve any appointment that the
Director made.

Recognizing the possibility that the appointment process
might lead to a predilection to favor one side over the other,
the New Jersey Supreme Court removed the approved panel list from
the exclusive control of the OAE and took back its own
supervision and control.  This action did not affect Paragano's

case, and his hearing was held pursuant to the pre-2011
procedure.

For many years, New Jersey disciplinary proceedings were
held under the old rule. There is nothing in the record that
suggests that a biased special hearing master resulted in any
particular case. The danger was an unrealized possibility, but
not a ground to challenge the proceedings against Paragano.

### D.  **SPECIAL MASTER'S RELATIONSHIP TO CHAMPI FAMILY**

Paragano asserts that the Special Master knew the family of
Champi, one of OAE's principal witnesses. According to Paragano,
the Special Master stated as an aside after five days into the
hearing, that he had presided over Champi's father's adoption of
Champi's handicapped sister and made statements that evidence his
admiration for the Champi family. (The father's name was also
Samuel Champi.)

The record discloses what actually happened and casts
serious doubt upon Paragano's post hearing version. As soon as
the issue arose during the hearing, the Special Master disclosed
on the record that he had presided over an adoption proceeding
involving Champi's family and Paragano's attorney consented on
the record to the Special Masters continuing as such.

> Judge Friend: Mr. Champi, if you would
> come forward please:

[Samuel Champi, Junior, Senior]

Judge Friend: Before we proceed, Mr.
Champi, putting your face together with the
name strikes a chord. Didn't I sit on a
matter in Mercer County that you were
involved in?

Mr. Champi: Maybe. I don't know. I
hope it wasn't bad.

Judge Friend: It was a very pleasant
duty, as a matter of fact.

Counsel, do you want to approach for a
minute?

[Whereupon, there was a discuss off the
record].

Judge Friend: I have advised counsel
that I had the pleasure of presiding over an
adoption of what turned out to be the
witness's sister. I thought the witness
looked so much like his father. That was my
only contact with the family. Does anyone
have a problem with my continuing?

Mr. Froehling [Respondent's counsel]: No
objection.

Mr. Sweeney: No objection, Judge.

### E. **FAILURE OF PARAGANO TO OBTAIN FULL DISCOVERY**

Paragano was not given the internal files of Provident until

just prior to the hearing. The files contained documents showing

that full and current information had been provided to Provident,

as noted above. Paragano contends that Boffa's files were not

given to him and his counsel sufficiently in advance of the

hearing to verify that there were other persons in Boffa's firm

with relevant knowledge of the case who could have testified on
Paragano's behalf (specifically Shaljian, Boffa's partner who
wrote the note referring to an imminent Arlington, Ege and Park
closing). Paragano contends that initial discovery would have
disclosed two facts that would have impeached Fernandes'
testimony, i.e., i)correspondence between Boffa and Fernandes and
notes that Fernandes had been hiding the fact that one of his
properties (the Ege parcel) was the subject of a $320,000 profit
from a flip following execution of the Settlement Agreement and
ii)handwritten notes that Boffa and his client knew from the
start that Paragano was going to take title to the Arlington
property.

For the purpose of the federal hearing, the Court has
concluded that the bank fraud was not established by clear and
convincing evidence - in fact was negated by the evidence.  The
belatedly disclosed Provident documents supplement the evidence
in this regard.

As noted above, the evidence, including the L-1 to L-10
documents clearly and convincingly establish that Paragano
concealed from his partners his acquisition of Arlington.  The
belated production of Boffa's files would not have affected that
conclusion.

**F. FAILURE OF PROOF BY CLEAR AND CONVINCING EVIDENCE**

Paragano contends that the state failed to prove either the

charge of fraud on his partners or fraud on the bank by clear and
convincing evidence. The clear-and-convincing evidence standard
has been recognized as the applicable standard in disciplinary
proceedings in New Jersey. In re Gross, 67 N.J. 419. As noted
above, for the purpose of the Order to Show Cause proceedings in
this Court, the bank fraud has not been established by clear and
convincing evidence; the fraud on Paragano's partners has been
established by clear and convincing evidence. This subject has
been covered in preceding sections of this Opinion.

## G.    ABSENCE OF EVIDENCE TO SHOW THAT
## OCTOBER 25, 2003 E-MAIL WAS INVALID

According to Paragano, Fernandes corresponded with Paragano
after the Arlington closing stating in an e-mail with copies to
Boffa, "please send me the closing statement for your closing on
Arlington." Exhibits 25 and 26. This showed that Fernandes knew
about the Arlington closing and was following up asking for the
closing documents. Fernandes denied sending that e-mail at any
time.

Pages 31 to 34 of the OAE's written summation details the
reasons why the document, which is also a version of LP-4 (an
October 25, 2003, 6:55 p.m. e-mail from Fernandes to Paragano
with a copy to Boffa) is a doctored version. This e-mail was not
discussed in Paragano's statement to the OAE, was not provided in
discovery, was not referenced in Paragano's answers, Pre-Trial
Report or Pre-Trial Brief. It first appeared during OAE's June

23, 2009 file inspection at Paragano's office after the June 15, 2009 hearing had been adjourned after the production of LP-1 and LP-2. Fernandes immediately complained that the document was a fraud.

Subsequent to the production of the document, Boffa located his file, which previously was thought to be lost. The file was inspected by OAE, and a copy of LP-4 was not in the file. Boffa testified that LP-4 would have jumped out at him and he would have immediately contacted his client and changed the Settlement Agreement.

The OAE referred to subsequent e-mail correspondence, which makes no sense if LP-4 were legitimate. The OAE referred to other circumstances pointing to the fraudulent nature of LP-4.

## H. **LACK OF EVIDENCE PARAGANO MISLED FERNANDES**

The Special Master stated in his Report that "[r]espondent also misled Fernandes into believing that Fernandes would be able to claim a part of the losses incurred by Raritan on Fernandes' taxes." Paragano correctly argues that no evidence supports this conclusion. However, because the DRB rejected the Special Master's conclusion, it has no effect upon the outcome.

## I. **EXCESSIVE DISCIPLINE**

Paragano contends that even if the charges in the ethics complaint had been established, the discipline was excessive. He contends that no federal case could be found disbarring an

attorney-businessman for activities that (i) did not involve his services as an attorney; (ii) did not involve current or former clients, (iii) did not involve a conviction for criminal conduct; (iv) did not involve public office; (v) did not involve harm to third parties; and (vi) involved a transaction with sophisticated businessmen who had their own counsel.

It is true that both Fernandes and Champi were experienced sophisticated business persons and that in normal circumstances, misconduct by a business partner who happened to be an attorney would be resolved in civil or criminal proceedings and not in an attorney ethics proceeding. However, Paragano was an attorney, although not acting as such in this case. His misconduct vis-a-vis his partners reflected on the profession apart from his submission of fraudulent documents in the course of the ethics proceedings. It was the latter conduct, although not charged as a separate offense, that must be taken into account in deciding what discipline is called for.

Here both favorable and unfavorable character references were submitted to the OAE. The favorable references portray a lawyer who undertook a multitude of pro bono cases and who, as a citizen, engaged in numerous civic and charitable undertakings. However, in the defense of the ethics hearings before the Special Master, he engaged in the most reprehensible of legal tactics, creating and using false documents to establish his case and to

Page -36-

negate the charges against him.

Even though the Court finds that one of the two counts against him, bank fraud, was not established by clear and convincing evidence, the other count was proved by the necessary quantum of evidence, and in resisting that count, Paragano engaged in egregious conduct before the hearing officer. To disbar Paragano under those circumstances is not disproportionate discipline.

## VIII.  **CONCLUSION**

Paragano has not established any of the elements under Local Rule 104.1 that preclude the imposition of reciprocal discipline.

The procedure was not so lacking in notice or opportunity to be heard as to constitute a deprivation of due process.

In the matter of the charge of bank fraud, there was such an infirmity of proof establishing misconduct as to give rise to the clear convincing conviction that this Court could not, consistent with its duty, accept the Supreme Court's ruling as a final conclusion on that subject. However, in the matter of the charge of fraud upon his partners, there was clear and convincing evidence establishing the misconduct.

The imposition of the same discipline - disbarment - by this Court would not result in grave injustice.

The misconduct established together with Paragano's prior discipline and unethical conduct during the course of these

proceedings, do not warrant substantially different discipline.

This Court will enter an Order disbarring Paragano from the practice of law before this Court.

**s/ Dickinson R. Debevoise**
**DICKINSON R. DEBEVOISE**
**U.S.Senior District Judge**

**DATED: February 5, 2014**